VIRGINIA STEVEDORING CORPORATION, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket Nos. 61343, 68831.   Filed July 31, 1958.

*Melvin A. Albert, Esq.*, for the petitioner.
*Charles M. Greenspan, Esq.*, for the respondent.

ARUNDELL, *Judge:* Respondent determined deficiencies in income tax in these consolidated proceedings as follows:

| Docket No. | Taxable year ending— | Deficiency |
| --- | --- | --- |
| 61343 | Feb. 29, 1952 | $78, 811. 49 |
| 68831 | Feb. 28, 1953 | 7, 084. 20 |
| 68831 | Feb. 28, 1954 | 16, 308. 96 |

The issues are: (1) Whether the respondent erred in determining that petitioner was not entitled to the benefits of section 474 of the Internal Revenue Code of 1939 for each of the taxable years in question, and (2) whether the respondent erred in computing the adjusted excess profits tax net income of petitioner for the taxable year ended February 29, 1952, by failing to take into consideration an unused excess profits credit of the taxable year ended February 28, 1951.

### FINDINGS OF FACT.

Some of the facts were orally stipulated and are so found.

Petitioner is a New York corporation organized in 1924 by Harry C. McClarity.   It filed its income tax returns for the years in question with the director of internal revenue for the first district of New York. By consents duly filed, petitioner extended the period of limitation upon assessment of income and profits taxes for its taxable years ended February 28, 1951, and February 29, 1952, to June 30, 1956, and for its taxable years ended February 28, 1953, and February 28, 1954, to June 30, 1958.   The deficiencies determined by the respondent have been paid, together with interest thereon, solely for the purpose of stopping the running of interest.

Petitioner kept its books and filed its tax returns on an accrual basis.

The statutory notice of deficiency in Docket No. 61343 was mailed on December 12, 1955, and the statutory notice of deficiency in Docket No. 68831 was mailed on April 18, 1957.   In the statement attached to the deficiency notice in Docket No. 61343, the respondent said:

It is held that you are not entitled to the benefits of Section 474 of the Internal Revenue Code of 1939 in the computation of your excess profits credit for the taxable years ended February 28, 1951 and February 29, 1952. Accordingly, your excess profits credit has been computed on the average base period net income method, based on growth for said years ended February 28, 1951 and February 29, 1952.

A similar explanation of respondent's determination in Docket No. 68831 was made in the statement attached to the deficiency notice dated April 18, 1957.

Union Stevedoring Corporation (hereinafter called Union) and Acme Scaling Company, Incorporated (hereinafter called Acme), are New York corporations, and Covington Maritime Corporation (hereinafter called Covington) is a Maryland corporation, which corporations were organized in 1919. Since about 1941 McClarity and his wife owned all of the stock of Union and Acme directly; 98.08 per cent of the stock of Covington was owned by Union. The balance of Covington's stock, namely, 1.92 per cent, was owned directly by McClarity.

Petitioner and the three above-mentioned corporations were engaged as marine contractors and stevedores at the New York, Philadelphia, Baltimore, and New Jersey waterfronts. Covington's activities were restricted to the Baltimore waterfront. Since the middle 1930's and until April 15, 1949, petitioner and Acme did not actively engage in stevedoring (except on a comparatively small scale in the case of Acme), the petitioner renting its gear and equipment to Union and Covington, and Acme engaging in the repair and services of the gear and equipment rented by Union and Covington. As of February 28, 1949, the gear which was thus being rented to Union by petitioner for an annual rental of $20,400 had a book value of $2,305.

On or about April 7, 1949, petitioner's authorized and issued capital stock consisted of 100 shares of common, which was all owned by McClarity and his wife Hazel D. McClarity. At about this time petitioner's authorized capital stock was increased to 1,000 shares of common. Prior to April 15, 1949, petitioner declared a stock dividend of 6½ additional shares for each share outstanding, thus making a total of 750 shares of common stock outstanding on April 15, 1949. On or about April 13 or 14, 1949, McClarity made a contribution to the petitioner of $7,500, which was recorded on the books of petitioner as capital surplus.

On April 15, 1949, McClarity and his wife sold all of their stock in petitioner for $120,000 to six key executives who had been associated with McClarity for about 8 to 35 years. These six executives purchased the stock upon the distinct agreement and understanding that the said purchase was subject to a voting trust agreement entered into on April 15, 1949, and signed by McClarity as voting trustee, Mc-

Clarity's wife as successor voting trustee, the six executives as stockholders and Virginia Stevedoring Corporation by its president. Under this agreement each of the six executives was to receive a voting trust certificate entitling him or her to receive the number of shares so purchased 10 years from April 15, 1949. Paragraph 5 of the voting trust agreement provided that:

The shares of stock of said Corporation * * * shall be vested in the Voting Trustee and * * * the Voting Trustee shall as to all stock so held by him possess and be entitled to exercise all stockholders rights of every kind * * * and the holders of voting trust certificates shall not have any right with respect to any such stock held by the Voting Trustee to vote or take part in or consent to any corporate or stockholders action of said Corporation.

On April 15, 1949, Union loaned petitioner $150,000. This loan was subsequently repaid by petitioner. The record is silent as to the duration of the loan or the date of repayment.

All transactions between petitioner, Union, Covington, and Acme, as well as the sale of the stock of petitioner by McClarity and his wife to the aforesaid six key executives, were pursuant to a plan to sell and transfer all of the income-producing assets of Union, Covington, and Acme to petitioner.

On April 15, 1949, petitioner and Union entered into a lease agreement whereby petitioner agreed to lease certain heavy gear from Union for an annual rental of $75,000 for a period of 2 years. The gear thus rented to petitioner by Union then had a book value on the books of Union of $59,084.09. Paragraph 11 of the lease agreement provided:

11. Upon compliance with all of the terms and conditions hereof, and upon notice in writing from Lessee to Lessor not less than sixty days prior to the expiration of said two year period, the Lessee may renew this lease on the same terms and conditions for an additional period of two years, and thereafter similarly for three additional two year periods, provided that Lessor and Lessee for each renewal period of two years within two months prior to the expiration of any period shall agree upon the amount of rental for the leased machinery for the succeeding two year period.

On March 3, 1951, petitioner renewed the above lease with Union for another 2-year period for the same annual rental of $75,000. The renewal lease also provided that petitioner was to replace any outmoded equipment not to exceed a total amount of $25,000 for any one year, and was to be credited with the salvage value of any such outmoded equipment.

On April 15, 1949, Union assigned to petitioner a certain lease made by William Kohlenberg to Union dated February 28, 1947, covering the premises known as No. 102 Oregon Avenue, Philadelphia, Pennsylvania, together with the premises and appurtenances therein described. On March 9, 1950, petitioner leased from Kohlenberg cer-

tain garage property at 104 Oregon Avenue in Philadelphia for 5 years, beginning June 1, 1950, at a yearly rental of $1,800, which property was to be used and occupied as a warehouse and office and for no other purpose.

On April 15, 1949, petitioner agreed to rent from Union the premises located at 115 Kent Avenue, Brooklyn, New York, for an annual rental of $5,500 for a 2-year period beginning April 15, 1949. During the term of this lease, Union, Covington, and Acme continued to have an office at 115 Kent Avenue for the purpose of keeping their books and records. After April 15, 1949, those three corporations did not engage in any stevedoring business.

On April 15, 1949, petitioner agreed to rent from Union the premises located at 1201 Haubert Street, Baltimore, Maryland, for an annual rental of $5,500 for a 2-year period beginning April 15, 1949.

The above-mentioned Kent Avenue and Haubert Street properties had a book value on the books of Union of $62,273.31 on April 15, 1949.

On April 15, 1949, Union, acting for itself, Covington, and Acme, entered into an agreement with petitioner wherein it agreed to sell to petitioner certain properties of Union, Covington, and Acme for the sum of $120,000, evidenced by petitioner's promissory note in such amount, payable on demand, with interest at 2 per cent per annum from April 15, 1949.

As the result of a letter from petitioner to Union dated April 27, 1949, the purchase price of the properties was fixed at $175,000. The properties so purchased by petitioner from Union, Covington, and Acme, together with the book value thereof on the books of those corporations as of April 15, 1949, and the total purchase price of the properties purchased were as follows:

| | Book value | Purchase price |
|---|---|---|
| Union: | | |
| Auto and/or truck | $4,867.19 | |
| Small gear and equipment | 7,242.68 | |
| Total purchase price | | $137,375 |
| Covington: | | |
| Auto and/or truck | 2,751.88 | |
| Small gear and equipment | 380.10 | |
| Total purchase price | | 35,565 |
| Acme: | | |
| Small gear and equipment | 174.83 | |
| Total purchase price | | 2,060 |
| Total | 15,416.68 | 175,000 |

The book value of all of the assets and liabilities of Union, Covington, and Acme as of April 15, 1949, including the properties leased and sold on that date, as hereinbefore set out, is as follows:

| | Union | Covington | Acme |
|---|---|---|---|
| *Assets* | | | |
| Cash | $916,721.45 | $204,537.99 | $66,134.00 |
| Trade accounts receivable | 874,777.54 | 156,943.73 | |
| Other receivables: | | | |
| Due from petitioner | 20,841.82 | | |
| Due from Covington | 1,613.90 | | |
| Due from employees | 395.05 | | |
| Taxes receivable | 22.70 | | |
| Unexpired insurance | 339.19 | 46.58 | |
| Due from Union | | 971.09 | 5,180.00 |
| Total other receivables | 23,212.66 | 1,017.67 | |
| Notes receivable: | | | |
| Due from petitioner | 150,000.00 | | |
| Due from employees | 2,664.00 | | |
| Mortgage receivable: | | | |
| Webster County, N. Y | | 21,108.68 | |
| Railroad bonds | 5,725.00 | | |
| Stock—Covington | 42,447.34 | | |
| Business insurance (unexpired) | [1] 14,465.02 | 2,108.68 | 131.00 |
| Unemployment ins. rebates | 5,150.81 | | |
| Employees retirement account | 5,000.00 | | |
| Automobiles | 4,181.24 | | |
| Leased properties: | | | |
| Large gear and equipment | 59,084.09 | 2,383.54 | |
| Land and buildings | 62,273.31 | | |
| Furniture and fixtures | 1,861.99 | 116.26 | |
| Total of leased properties | 123,219.39 | 2,499.80 | |
| Properties sold: | | | |
| Automobile and/or truck | 4,867.19 | 2,751.88 | |
| Small gear and equipment | 7,242.68 | 380.10 | 174.83 |
| Total of properties sold | 12,109.87 | 3,131.98 | |
| Total assets | 2,179,674.32 | 391,348.53 | 71,619.83 |
| *Liabilities* | | | |
| Adjustments of contract billings to American Export Lines, Inc | 123,204.35 | 105,049.36 | |
| Federal income taxes | 461,250.93 | 54,655.42 | 271.38 |
| Interest payable on Federal income taxes | 28,820.51 | | |
| Accounts receivable adjustments | 6,170.34 | | |
| Due to Acme | 5,180.00 | | |
| Due to Covington | 2,584.99 | | |
| Claims payable | 14,200.55 | 2,937.16 | |
| Accounts payable | 18,206.84 | 8,078.58 | |
| Unemployment insurance—Deferred insurance, welfare, pension, vacation pay payable | 56,089.96 | 3,507.52 | |
| Accrued taxes (other than Federal income taxes) | 39,890.47 | 3,658.43 | |
| Unclaimed wages | 3,928.19 | | |
| Retirement reserve | 5,000.00 | | |
| Accrued payroll | 19,398.35 | | |
| Other liabilities | 413.67 | | |
| Total liabilities | 789,489.96 | 177,886.47 | 271.38 |

[1] This asset was acquired by petitioner at the face value of $14,465.02 on April 15, 1949.

For about 8 years prior to April 15, 1949, Union had contracts to perform stevedoring services for American Export Lines, Inc., which constituted about 98 per cent of Union's stevedoring business. During the base period years (1946–1949) Union's gross billings and net profits realized from those contracts, before Federal income taxes, averaged per year about $4,565,000 and $515,000, respectively.

After April 15, 1949, Union did not have any gross billings. With the written consent of American Export Lines, Inc., Union transferred to petitioner all the stevedoring contracts it had with the

American Export Lines, Inc., effective as of April 15, 1949. Thereafter, all the stevedoring work previously performed for American Export Lines, Inc., by Union was performed by petitioner.

For about 8 years prior to April 15, 1949, Covington had contracts to perform stevedoring services for American Export Lines, Inc., and Black Diamond Steamship Corporation, which constituted about 97 per cent of Covington's stevedoring business. During the base period years, Covington's gross billings and net profits realized from those contracts, before Federal income taxes, averaged about $553,000 and $58,000, respectively.

After April 15, 1949, Covington did not have any gross billings. Its then-existing contract with American Export Lines, Inc., was assigned to petitioner, effective April 15, 1949. On April 5, 1949, Black Diamond Steamship Corporation addressed a letter to McClarity as president of Covington, the first two paragraphs of which are as follows:

> In acknowledgment of your letter of March 30th, 1949 we wish to confirm that it will be satisfactory to us for the Virginia Stevedoring Corporation to accept all the rates, terms, and conditions now in force in our existing contract with the Covington Maritime Corporation.
>
> To accomplish this we would like to suggest that the Virginia Stevedoring Corporation submit a new contract duly executed by them for our signature. We would appreciate your having the contract dated April 15th, 1949, the effective date of your retirement.

Effective April 15, 1949, a new stevedoring contract was entered into between petitioner and Black Diamond Steamship Corporation and thereafter all the stevedoring work previously performed for Black Diamond Steamship Corporation as well as for American Export Lines, Inc., by Covington was performed by petitioner.

During the base period, the gross billings and net profits of Acme realized before Federal income taxes averaged per year about $33,400 and $10,000, respectively.

After April 15, 1949, Acme did not have any gross billings and all the stevedoring work previously performed by Acme was performed by petitioner.

For about 8 years prior to April 15, 1949, petitioner had no gross billings from stevedoring work. During that period it earned an average of about $20,400 a year gross from the rental of gear and equipment. Thereafter, its gross billings from stevedoring for the periods hereinafter mentioned were as follows:

| Period | Gross billings |
|---|---|
| Apr. 15, 1949 to Feb. 28, 1950 | $3, 165, 146. 36 |
| Year ended Feb. 28, 1951 | 4, 410, 523. 02 |
| Year ended Feb. 29, 1952 | 5, 737, 111. 28 |
| Year ended Feb. 28, 1953 | 5, 073, 514. 69 |
| Year ended Feb. 28, 1954 | 5, 456, 620. 38 |

Approximately 97 or 98 per cent of the above-mentioned gross billings earned by petitioner subsequent to April 14, 1949, was from services performed by petitioner for American Export Lines, Inc., and Black Diamond Steamship Corporation.

Goodwill was not carried as an asset on the books of either Union, Covington, or Acme.

On April 15, 1949, petitioner employed substantially all of the former employees of Union, Covington, and Acme. At that time Union had about 800 employees and Covington about 250.

On various dates between August 4, 1950, and November 13, 1950, Union purchased various units of heavy cargo handling machinery for a total cost of $33,383.79. The account in Union's ledger reflecting those purchases is "Gear—in reserve—New York."

During its fiscal year ended February 28, 1951, Union paid McClarity a salary of $30,000 for services rendered. Union's other three officers received total compensation of $14,000 for that fiscal year.

On October 15, 1951, Union sold to petitioner various office furniture and fixtures for $12,000.

Petitioner paid rent to Union on the large gear and equipment, land, and buildings (Kent Avenue and Haubert Street properties) until November 30, 1951. On that date the said large gear and equipment, land, and buildings were distributed in liquidation by Union to its stockholders McClarity and his wife, and petitioner then paid rent to the stockholders of Union until January 31, 1952, on which date the stockholders sold to petitioner the large gear and equipment for $232,000 and the land and buildings for $92,000, which total amount of $324,000 was paid by petitioner.

On September 26, 1949, the board of directors and stockholders of Union held a joint meeting and adopted a resolution wherein it was resolved that the corporation liquidate its business and that upon the completion of.the liquidation the officers be authorized to take the necessary steps for the dissolution of the corporation and to execute all the necessary papers and documents to effect such dissolution.

Between September 30, 1949, and November 27, 1956, Union distributed in liquidation to its stockholders cash in the total amount of $1,506,545 and gear, land, and buildings in the total amount of $122,754.96. The latter amount was distributed on November 30, 1951.

On September 26, 1949, the board of directors and stockholders of Covington held a joint meeting and adopted a resolution wherein it was resolved that the corporation liquidate its business and that upon the completion of the liquidation the officers be authorized to take the necessary steps for the dissolution of the corporation and to execute all the necessary papers and documents to effect such dissolution.

Between February 25, 1950, and February 28, 1953, Covington distributed in liquidation to its stockholders (Union and McClarity) cash in the total amount of $463,048.49, gear and fixtures in the amount of $1,100, and a mortgage in the amount of $20,213.48. The gear and fixtures were distributed on November 30, 1951.

At the time of the hearing of these proceedings (January 22–23, 1958), neither Union nor Covington had been dissolved but were still in existence.

Between May 12, 1950, and November 26, 1956, Acme distributed in liquidation to its stockholders (McClarity and his wife) cash in the total amount of $65,100.73. The record is silent as to whether Acme has or has not been dissolved.

Union and Covington paid off all of their liabilities owing on April 15, 1949, by February 28, 1950, except the accounts owing to American Export Lines, Inc., which accounts were settled on September 18, 1951. As a result of the settlement of its account with American Export Lines, Inc., Covington instituted a suit against the United States for refund of taxes, which suit is presently pending in the District Court for the Eastern District of New York. This is the only open item of any consequence on the books of Covington at the present time.

The base period excess profits net income of petitioner, Union, Covington, and Acme was as follows:

| Corporation | Fiscal year ended | | | |
|---|---|---|---|---|
| | Feb. 28, 1947 | Feb. 29, 1948 | Feb. 28, 1949 | Feb. 28, 1950 |
| Petitioner | $3,579.60 | $3,472.33 | $4,034.89 | $337,749.79 |
| Union | 510,542.46 | 555,902.00 | 491,775.09 | 29,674.81 |
| Covington | 128,127.82 | 27,092.16 | 79,017.36 | (4,385.01) |
| Acme | 10,623.05 | 10,622.93 | 8,852.30 | 1,128.10 |
| Totals | 652,872.93 | 597,089.42 | 583,679.64 | 364,167.69 |

The combined base period capital additions of the four above-mentioned corporations for the following fiscal years were as follows:

Fiscal year ended Feb. 28, 1949 _____ $1,320,775.74
Fiscal year ended Feb. 28, 1950 _____ 1,670,433.29
Fiscal year ended Feb. 28, 1951 _____ 1,750,378.70

The net capital additions of petitioner for the taxable years were as follows:

Fiscal year ended Feb. 29, 1952 _____ $142,980.37
Fiscal year ended Feb. 28, 1953 _____ 409,536.83
Fiscal year ended Feb. 28, 1954 _____ 453,758.40

Petitioner in its excess profits tax returns for the years in question claimed excess profits net income and excess profits credits as follows:

| Fiscal year ended | Excess profits net income | Excess profits credit |
|---|---|---|
| Feb. 29, 1952 | $570,499.71 | $559,417.50 |
| Feb. 28, 1953 | 312,569.94 | 595,900.96 |
| Feb. 28, 1954 | 373,373.82 | 604,017.98 |

On May 10, 1954, a claim for refund on Form 843 was filed by petitioner for its fiscal year ended February 28, 1951.

The respondent determined petitioner's excess profits net income and excess profits credit for the said taxable years as follows:

| Fiscal year ended | Excess profits net income | Excess profits credit |
|---|---|---|
| Feb. 28, 1951 | $420,758.08 | $287,087.28 |
| Feb. 29, 1952 | 578,565.66 | 299,741.59 |
| Feb. 28, 1953 | 353,090.70 | 329,476.70 |
| Feb. 28, 1954 | 399,628.30 | 334,783.24 |

OPINION.

Petitioner is in agreement with the excess profits net income as determined by the respondent but contends that it is entitled to the benefits of section 474, I. R. C. 1939, and that under these benefits its excess profits credit for the fiscal years 1951 to 1954, inclusive, should be the amounts of $550,104.80, $559,417.50, $587,024.94, and $592,331.48, respectively, instead of the amounts determined by the respondent. Section 474 was added to the Code by section 521 of the Revenue Act of 1951, approved October 20, 1951, and by section 523 made effective with respect to taxable years ending after June 30, 1950. The material provisions of the section are in the margin.[1]

---

[1] Part IV—Excess Profits Credit Based on Income in Connection With Certain Taxable Acquisitions Occurring Prior to December 1, 1950

SEC. 474. EXCESS PROFITS CREDIT BASED ON INCOME—CERTAIN TAXABLE ACQUISITIONS.

(a) DEFINITIONS.—For the purpose of this part—

(1) PURCHASING CORPORATION.—The term "purchasing corporation" means a corporation which, before December 1, 1950, acquired—

(A) In a transaction * * * substantially all of the properties (other than cash) of another corporation * * *

\* \* \* \* \* \* \*

(2) SELLING CORPORATION.—The term "selling corporation" means a corporation, * * * properties of which were acquired by a purchasing corporation in a transaction described in paragraph (1).

(3) PART IV TRANSACTION.—The term "part IV transaction" means a transaction described in paragraph (1).

(b) AVERAGE BASE PERIOD NET INCOME OF PURCHASING CORPORATION.—The average base period net income of a purchasing corporation, if computed with reference to this part, shall be determined under section 435 (d). * * *

(c) LIMITATIONS.—This part shall apply only if each of the following conditions is satisfied:

(1) The selling corporation (A) did not, after the part IV transaction * * * continue any business activities other than those incident to its complete liquidation, and (B) within a reasonable time after ceasing business activities, completely liquidated in a transaction * * * and ceased existence.

(2) During so much of the base period of the purchasing corporation and of the period thereafter as preceded the part IV transaction, the properties acquired in the part IV transaction were substantially all of the properties (other than cash) which were used, or which in the ordinary course of business replaced properties used, by

In accordance with section 474 (f), Regulations 130 were amended by T. D. 5998, 1953–1 C. B. 372, 380–389, so as to include in the regulations section 40.474–1 to –6.

Our first problem is to determine whether petitioner is a "purchasing corporation" as that term is defined in section 474 (a) (1) of the 1939 Code. In order so to qualify, petitioner must have, before December 1, 1950, acquired "substantially all of the properties (other than cash) of another corporation." Petitioner contends it acquired as of April 15, 1949, substantially all of the properties (other than cash) of Union, Covington, and Acme. The respondent contends otherwise.

We have set out in our findings the book value of all of the assets and liabilities of Union, Covington, and Acme, as of April 15, 1949. Although the statute uses the term "properties" rather than "assets," it has been held that the statutory term includes accounts receivable. *Pillar Rock Packing Co.* v. *Commissioner*, 90 F. 2d 949 (C. A. 9, 1937), affirming 34 B. T. A. 571. In that case the Ninth Circuit said: "The word [properties] must be taken in its ordinary sense, and as it is a comprehensive word, it includes accounts receivable. If Congress had intended to restrict the meaning of the word, it would have done so." A look at the list of assets of Union, Covington, and Acme discloses that receivables are by far the largest part of the assets of those corporations, other than cash, and petitioner did not acquire any of those receivables.

Unquestionably, petitioner acquired the properties labeled in our findings as "Properties sold" of the total book value of $12,109.87 in the case of Union, $3,131.98 in the case of Covington, and $174.83 in the case of Acme. It also acquired the unexpired business insurance of Union of the book value of $14,465.02. Obviously, these acquisitions by themselves do not constitute "substantially all of the properties (other than cash)" of these three corporations.

the selling corporation * * * in the production of the excess profits net income (or deficit therein) which under subsection (b) increases or decreases the excess profits net income of the purchasing corporation. For the purpose of this paragraph, if a business in the hands of both the selling corporation and the purchasing corporation was operated under a substantially identical franchise or license, granted by the same person, such franchise or license shall be deemed acquired by the purchasing corporation from the selling corporation.

(3) The business or businesses acquired in the part IV transaction (including the properties so acquired or properties in replacement thereof) were operated by the purchasing corporation from the date of such transaction to the end of the taxable year * * *

*     *     *     *     *     *     *

(f) REGULATIONS.—The Secretary shall by regulations prescribe rules for the applications of this part. Such regulations shall include the following rules:

*     *     *     *     *     *     *

(4) DUPLICATION.—Rules for the application under this part of the principles of section 462 (j) (1) and the other provisions of part II relating to the prevention of duplication.

Petitioner strongly contends that in addition to the acquisitions mentioned in the previous paragraph, it also "acquired" the so-called leased properties totaling $123,219.39 in the case of Union, and $2,499.80 in the case of Covington. It argues that it was a part of the plan to purchase these properties and would have done so if it had had sufficient funds. Being without sufficient funds, it arranged to lease them until such time as it could purchase them. It argues further that since in fact it did actually purchase the said properties on January 31, 1952, we should find, in substance, that it acquired the properties prior to December 1, 1950. It also argues that since section 474 was not enacted until October 20, 1951, it might have arranged its affairs with Union and Covington somewhat differently so as to meet the definition of a purchasing corporation contained in section 474 (a) (1) (A). We had substantially this identical question before us in *Daniels Buick, Inc.*, 26 T. C. 894, affirmed per curiam by C. A. 6, at 251 F. 2d 528, wherein we held that the petitioner there did not "acquire" the property which it had leased from another for a term which would last no more than 10 years and possibly only 5. In affirming our decision, the Sixth Circuit said:

The five-year lease with an option to renew for an additional five-year period with an option of first refusal is not an acquisition of assets within the meaning and intent of Section 474. Senate Report No. 781, 82nd Congress, 1st Session (Int. Rev. Cum. Bull. 1951–2, 458 at pp. 511–512) ; Joint Committee Staff Summary of Provisions of the Revenue Act of 1951 (Int. Rev. Cum. Bull. 1951–2, 287, 329).

We hold, therefore, that as to the so-called leased properties, petitioner did not "acquire" such properties before December 1, 1950, within the meaning of that term as used in section 474. *Daniels Buick, Inc.*, *supra*.

Petitioner further contends that the most valuable properties transferred by Union and Covington were their stevedoring contracts which alone were responsible for the excess profits income and which yielded Union in billings, millions of dollars per year prior to April 15, 1949, at an average of over half a million dollars in profit in 1947, 1948, and 1949, and yielded Covington billings of an average of about $553,000 a year and net profits before taxes of an average of about $58,000 per year during those base period years prior to April 15, 1949. In its brief it argues that:

The value of the good will of these contracts was most substantial and the failure to record it on the books of any of the corporations, or to testify with regard thereto is immaterial, for the facts before the Court reveal that the value of these contracts far exceed the total of the physical assets transferred or remaining * * *

Goodwill was not carried as an asset on the books of either Union, Covington, or Acme, and petitioner did not purport to acquire good-

will from the selling companies if, indeed, goodwill as such could be acquired in connection with the purchase of certain equipment and properties. At the time of trial, no evidence was offered as to the existence or value of goodwill. The contracts which Union and Covington had with American Export Lines, Inc., and Black Diamond Steamship Corporation, which petitioner argues were the basis of its goodwill, were not introduced in evidence and we do not know their terms or how long they had to run, etc. It appears that Black Diamond entered into a new contract with petitioner and American Export Lines consented to petitioner's carrying out Union's and Covington's obligations under those contracts, at or about the time the purchase by petitioner took place. Even if a value be assumed for the contracts in the hands of petitioner, the same value would have to be added to the book value of the assets of Union, Covington, and Acme as of April 15, 1949, and when consideration is given to the substantial amount of properties retained by the three so-called selling corporations, the amount acquired by petitioner would not in our opinion amount to "substantially all" of the properties (other than cash) of the three corporations.

Petitioner further argues that, in determining whether the acquisitions by petitioner constitute substantially all of such properties, the properties retained by the selling corporations should be offset by the liabilities of these corporations. Respondent points out that each of the three so-called selling corporations had sufficient cash on hand to pay off all of the liabilities, and that it does not appear that such liabilities as existed were directly related to the properties or assets of Union, Covington, and Acme as incumbrances thereon. We do not think the statute requires that the retained assets be offset by the liabilities in determining whether a potential purchasing corporation acquired substantially all the properties (other than cash) of a so-called selling corporation. We had somewhat the same question before us in *Milton Smith*, 34 B. T. A. 702, and, at page 705, we said:

> The respondent contends that the phrase "substantially all the properties" refers to the gross assets, rather than net, and that the 71 percent of gross assets transferred in this case was not "substantially all." We think it unnecessary to decide whether the quoted phrase refers to the gross value of the assets or such value less liabilities. Whether the properties transferred constitute "substantially all" is a matter to be determined from the facts and circumstances in each case rather than by the application of any particular percentage. It might well be, as said by the respondent, that if a corporation having gross assets of $1,000,000 and liabilities of $900,000 transferred only the net assets of $100,000 the result would not come within the intent of Congress in its use of the words "substantially all." Any number of further suppositions might be made concerning the case put by the respondent.

For the above-mentioned reasons, we hold that petitioner has failed to show that it acquired before December 1, 1950, substantially all of the properties (other than cash) of Union, Covington, or Acme. Therefore, it is not a "purchasing corporation" as that term is defined in section 474 (a) of the 1939 Code.

It thus becomes unnecessary for us to consider respondent's alternative contentions that not any of the three conditions stated in section 474 (c) as a prerequisite to the application of Part IV were satisfied, and that petitioner in computing the excess profits tax credits, for which it contends, made no adjustment for any possible duplication as is required under section 474 (f) (4). Cf. *Crater Lake Machinery Co.*, 29 T. C. 620, as to the matter of possible duplication. It may also be noted in passing that under section 474 (c) (1), one of the conditions that must be satisfied is that the selling corporations "ceased existence." In this connection, it was stipulated at the hearing that Union and Covington were still in existence and had not been dissolved.

It also becomes unnecessary for us to consider the second issue as to the unused excess profits credit adjustment.

The respondent's determination is sustained.

*Decisions will be entered for the respondent.*